Filed 6/18/26  P. v. Tyler CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOEY MICHAEL TYLER,<br><br>Defendant and Appellant. | F087190<br><br>(Super. Ct. No. F22905076)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Heather Mardel Jones, Judge.

William Safford, under appointment by the Court of Appeal, Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

A jury convicted defendant Joey Michael Tyler of second degree robbery (Pen. Code,[1] § 211; count 1), assault with a deadly weapon (§ 245, subd. (a)(1); count 2), felony receiving stolen property (§ 496, subd. (a); count 3), and misdemeanor receiving stolen property (§ 496, subd. (a); count 4). A great bodily injury enhancement to count 1 was found not true. Defendant admitted he was convicted of three prior serious felonies (§ 667, subd. (a)(1)), which also constituted strikes (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)). At sentencing, the court struck two of the prior serious felony enhancements and sentenced defendant on count 1 to a term of 25 years to life, plus five years for the remaining prior serious felony enhancement. Defendant was sentenced on count 2 to a concurrent term of 25 years to life; on count 3 to a term of four years, stayed pursuant to section 654; and on count 4 to 364 days in county jail with credit for time served. The court also imposed fines and fees, including a $10,000 restitution fine. (§ 1202.4, subd. (b).)

On appeal, defendant argues substantial evidence does not support his convictions for robbery and assault because video evidence categorically excludes him as the perpetrator of the crimes. He also argues his trial counsel was constitutionally ineffective in failing to object to and/or request admonitions and instructions regarding evidence, questioning, and argument concerning a jail phone call between defendant and his daughter. Finally, defendant argues his rights to due process, equal protection, and protection from excessive fines under the state and federal Constitutions were violated by the court's imposition of a $10,000 restitution fine.[2]

We reject defendant's contentions and affirm.

---

[1] Subsequent statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant also argued the court erred by imposing sentence on count 4 because this count had been dismissed. He later withdrew this claim of error, stating it was based on a misreading of the record.

# FACTUAL BACKGROUND

## I. Prosecution Case

At approximately 8:30 a.m. on March 18, 2022,[3] Harvey T. was driving his 2012 white Chevy Malibu while working for a delivery service. He made a delivery to the back of an apartment complex in Fresno and left the car running with the keys inside. When he returned a few minutes later, the car was gone. Among the items in his car at the time was a pair of bright blue Nike basketball shoes.

At approximately 10:00 o'clock that morning, Katherine D., who was eight months pregnant, sat outside a gas station convenience store in Clovis, waiting for her car to be washed. She was conversing with another woman at a table, on which she placed her purse. Her purse contained a few gift cards, 13 debit and credit cards, a wallet, a cell phone, and other items.

Katherine saw a white car pull into a parking space that was between the car wash seating area and the area where vehicles were vacuumed. Two men wearing masks were in the car. As the men talked, they looked Katherine's way, and the passenger pointed at her. Approximately five seconds later, the passenger exited the car, leaving the door open. The passenger was a Hispanic male, wearing bright blue shoes, dark-colored baggy jeans, a baggy camouflage sweatshirt, a red baseball cap, and a black mask or gaiter over his face. Katherine later described the passenger in a 911 call as "heavier set" or "stock[y]."

The passenger walked up to the side door of the convenience store, which was near the women, and pulled on it unsuccessfully as if it was locked, even though it was not locked. From three or four feet away, he asked the women where to pay for the car wash. The woman seated with Katherine told the passenger he could pay in the convenience store or take his car around to the car wash. The passenger attempted the

---

[3] Except as otherwise noted, all dates mentioned herein are in 2022.

3.

door again and claimed it was locked. He then turned around, snatched Katherine's purse as he walked by her, and ran to the white car.

Katherine chased after him and grabbed her purse as he was getting into the car, and they struggled in the passenger doorway of the car. The passenger kicked Katherine in the stomach; she told him she was pregnant, but he continued to kick her. Katherine said, "Give it back," and "Stop," and the passenger said, "Don't do this." The passenger told the driver, "Go, go, go," and the driver reversed and then pulled away. As the vehicle reversed, Katherine was caught in the passenger door and dragged for about 10 to 15 feet before she let go of the purse. As the white car drove away, Katherine shouted out its license plate number.[4] 911 was called. Video surveillance at the car wash captured the incident.

A community service officer testified that the video showed what appeared to be a tattoo on the back of the passenger's head.[5] The officer testified he was able to discern a tattoo with lettering when he viewed stills from the surveillance video at his desk, but he could not discern the lettering in the stills presented to the jury. While watching the video during his testimony, the officer described the tattoo as an area of discoloration across the back of the head between the passenger's hat and hat band.

Using "Find My iPhone," the Clovis Police Department tracked Katherine's cell phone. The first reported location, reported at approximately 11:48 a.m., was on southbound Highway 99, getting onto Highway 180 westbound. Shortly thereafter, the phone was reported to be at a grocery store in Fresno, approximately five to six miles from the car wash. By the time of the second location report, a couple of transactions for approximately $400 had already been made with Katherine's credit cards at a large retail

---

[4] The license plate number she shouted matched the license plate of Harvey's car, which had been taken earlier that morning.

[5] The jury later engaged in a jury view of the back of defendant's head.

store across the street from the grocery store. Law enforcement obtained video surveillance footage from the retailer. The video showed two women using Katherine's card and walking out of the store with merchandise.

Inside the grocery store was a kiosk machine that was known to law enforcement as a common location for thieves to sell stolen phones. At approximately 11:53 a.m., Katherine's phone was sold at the kiosk by Jose Garcia. Within 10 minutes of the sale, law enforcement responded to the grocery store, found the phone in the kiosk, and reviewed the grocery store surveillance footage. A detective reviewing the video observed two subjects, who had entered the store together, at the kiosk. One person, later identified by the detective as Garcia, wore a dark blue or black hat with a red bill. The other person stood next to Garcia and wore bright blue shoes that matched the shoes worn during the robbery.

Additional transactions were made on March 18 and 19, before Katherine was able to lock all her credit and debit cards. A majority of her missing cards were used at some point, and the transactions occurred at multiple locations including multiple fast-food locations, a clothing store, a smoke shop, and other retailers. The transactions totaled approximately $2,200.

Video surveillance and business records from a large retail store showed two females, later identified as defendant's sister Cecelia Castaneda (Cecelia) and mother Gloria Castaneda (Gloria), purchasing items with Katherine's cards on the afternoon of March 18. The first transaction at 1:21 p.m. in the electronics department was successful, but a second attempted transaction at the main register 12 minutes later was denied. The purchased items were later found at Cecelia and Gloria's apartment, where law enforcement believed defendant also was staying. Their apartment complex was within a half-mile of the apartment complex where Harvey's car was stolen.

At approximately 2:48 p.m., a purchase was made at a gas pump using Katherine's credit card. This transaction also was caught on video surveillance. The surveillance

5.

video showed a person believed by law enforcement to be defendant walking up to another person's vehicle, using the card at the kiosk, and pumping gas for the other vehicle before walking away. The person using the card was wearing bright blue shoes similar to those in the other surveillance videos, as well as a white shirt, jeans, a red bandana, and a black hat.

Video surveillance also captured one of Katherine's cards being used at a clothing store at approximately 5:00 p.m. The video showed a woman and man entering the store and purchasing items. The man was believed by law enforcement to be defendant due to his stature and clothing. He was wearing a white shirt, the same bright blue shoes as in the other videos, jeans, a black hat, and a red bandana, and was carrying a jacket.

The following Monday, March 21, law enforcement conducted surveillance at Garcia's residence and observed a white Chevy Malibu, which appeared to be the same type as used in the robbery, pull up to Garcia's house. Defendant exited the driver's seat of the Malibu and spoke with Garcia in front of the house. Defendant was wearing the same bright blue shoes as seen by detectives in the videos of the robbery and other locations. Soon thereafter, defendant got back into the Malibu and drove away. Law enforcement followed the Malibu to a gas station, where Garcia met defendant in his own car. Defendant then drove the Malibu to a fast-food restaurant, where defendant was arrested, while Garcia continued into the surrounding shopping center. Officers located one of Katherine's credit cards in defendant's right jacket pocket.

The vehicle identification number of the Malibu driven by defendant corresponded to the license plate number of the vehicle used in the robbery. However, at the time of defendant's arrest, the Malibu had two different license plates, neither of which belonged to the vehicle. The rear license plate had been stolen from a 2013 Chevy Malibu in Fresno on or around March 19. Officers ultimately determined the car had been "cold plated," meaning that a different license plate was placed on it in an attempt to avoid recognition as a stolen car. A search of the Malibu revealed paperwork belonging to

Harvey, who also was listed as the registered owner of the vehicle. The search also revealed multiple bank cards, a driver's license, a Mexico passport, and a cell phone, none of which belonged to Harvey or defendant.

After his arrest, defendant was transferred to the Clovis Police Department, where he was interviewed by Detective K. Anderson. When asked about the robbery, defendant stated he did not know of the incident. Defendant reported that he obtained the Malibu on March 19 from someone named Harvey. He acknowledged going with Garcia to the grocery store on March 18. He claimed Garcia owed him some money and needed to sell a cell phone to get the money to pay defendant back. When asked why he had Katherine's credit card in his pocket at the time of his arrest, defendant claimed Garcia had given it to him. In closing the interview, Anderson asked defendant how he could rob an elderly woman (referring to a prior case, which we discuss below) and a pregnant woman, and defendant just looked at Anderson and smiled or smirked.

Defendant engaged in multiple jail calls with Gloria and Cecelia, which were played for the jury. Defendant told Gloria, "Just tell them I gave it to you. Because I did give you guys the cards anyways, so I'm gonna tell him…. Tell Sissy and them to just say you got them from me." He was going to "take responsibility for buying the damn cards" because he was "guilty of that."

Defendant also engaged in a jail call with his daughter, Destiny, which was played for the jury. He admitted to Destiny that he was with Garcia at the kiosk machine, but claimed that the video the police had shown him of it was "clear it's not me." Destiny told defendant there was video of defendant at the car wash. Defendant asked, "What it show me doing?" Destiny replied, "Getting out the car, grabbing a purse, getting in and going." Then defendant asked, "It look just like me?" Destiny replied that it did, and that he had been wearing a mask.

7.

The prosecution also presented evidence that defendant had committed a prior robbery on December 14, 2013.[6] On that date, Donna L. was walking in a parking lot in Clovis when a Chevy Malibu drove very close to her leg, and a passenger in the car stuck their arm through the handle of her purse. Donna fought to maintain possession of her purse and slammed into the car as it continued to drive by. The passenger, who appeared to be a Hispanic male, yelled, "Go" to the driver, who was later identified as defendant. She eventually let go of her purse before the car picked up too much speed, at which point she fell and rolled. The Malibu, which had two different license plates on it, had been stolen. Defendant was convicted of the robbery.

## II.    Defense Case

Defendant testified in the defense case. He admitted he was charged with and pled guilty to the robbery of Donna. He denied participating in the robbery of Katherine.

On March 18, defendant was at his friend Jamie's house until about 11:00 a.m. While there, he talked to Garcia, who is a childhood friend, on the phone. Garcia asked defendant to come over as soon as possible, so defendant had Jamie drive him to Garcia's house. When defendant walked into Garcia's living room, he saw Garcia, Garcia's brother, and three others going through several bags from a discount retailer on the floor. Defendant also saw a pair of bright blue Nikes located "probably" at the foot of Garcia's bed.

Garcia had approximately three cell phones that he wanted to sell at a kiosk. Garcia wanted defendant to go with him to sell the phones and defendant agreed. While Garcia changed his clothes, defendant asked if he could try on the blue Nikes. Defendant put on the blue Nikes and wore them when he went with Garcia to the grocery store where the kiosk was located. The shoes were small for him, but he wore them anyway.

---

[6] This evidence was admitted pursuant to Evidence Code section 1101, subdivision (b).

Garcia asked defendant to use his driver's license to sell the cell phones and defendant initially agreed. However, Garcia "started telling [defendant] how they came in possession of [the phones]," and defendant changed his mind. Defendant did not know who the phone belonged to, but he knew it did not belong to Garcia. Garcia ended up using his own driver's license to sell the phone. Garcia received about $100 for the phone.

Garcia then gave defendant four credit cards. The credit cards bore a woman's name, specifically Katherine's, so defendant called his sister Cecelia and gave her one of the cards. After Cecelia and Gloria were caught using the card, defendant apologized to them in a jail phone call for giving them the card.

Defendant and Garcia used one of the cards to purchase meat and beer and then returned to Garcia's house. Around 3:00 p.m., defendant called Jamie and asked her if she wanted to go shopping. Garcia drove defendant to a gas station where Jamie had designated to meet. Using Katherine's credit card, they filled Jamie's gas tank, then filled Garcia's gas tank at a different station across the street. Also using Katherine's credit card, they filled the tanks of a couple bystanders in exchange for cash. Defendant went with Jamie to her apartment so she could change clothes. Around 4:00 or 5:00 p.m., defendant and Jamie went to the mall. They went to the clothing store and a few other stores before returning to Jamie's apartment.

Around 3:00 o'clock the next morning, Garcia called defendant and asked defendant to come remove a Chevy Malibu that Garcia's brother had left at his house. Garcia wanted the car off his property because it was stolen. Garcia lived across from a police substation and was worried the police would see the Malibu in the yard and come to his house. Jamie drove defendant to Garcia's house, where defendant entered the Malibu and saw that the registration was in Harvey's name. Defendant found five credit cards in Harvey's name in the side door. Garcia removed some items from the trunk and defendant then drove the Malibu to his sister's house. There, defendant walked around

9.

the block and stole some license plates to change out the plates on the Malibu. Over the next couple of days, defendant washed the car at a car wash and drove it around as if it was his.

On March 21, at around 10:00 a.m., defendant went to Garcia's house. Garcia told defendant his house was under surveillance. Defendant, who was wearing the blue shoes, noticed officers passing by in unmarked cars and started waving to get their attention, "being a clown." Defendant and Garcia went into the house for 20 to 30 minutes before deciding to leave to get food. Garcia drove his own car and defendant drove the Malibu. They went to a gas station and got cigarettes and a couple beers, then decided to go to a fast-food restaurant before returning to Garcia's house. Defendant was arrested at the fast-food restaurant.

At the police department, defendant saw Garcia in the holding cell across from him. Defendant talked to Anderson while in the holding cell. Defendant told Anderson that he had rented the car from Harvey, even though he never met Harvey. He did not want to tell Anderson that Garcia gave him the vehicle because Garcia was there in the holding cell during the conversation, they grew up together, and defendant did not want to be labeled a snitch.

In a jail call, defendant claimed he had bought a credit card from Garcia, even though Garcia had given it to him. He explained that he did not want to implicate Garcia in stealing the cards over the phone where he might be overheard by other inmates. For the same reason, he talked at one point about having traded shoes with Harvey.

In a jail call with his daughter, Destiny, defendant discussed the surveillance video of the robbery, which he had seen on the news while at the jail. He recalled his daughter saying that the person in the video looked like him, which made him sad. He denied that he asked Destiny, regarding the video, "What did *I* say?" and instead testified that he asked Destiny, "[W]hat did *he* say?" (Italics added, boldface omitted.) He acknowledged that he asked Destiny, "What does [the video] show me doing?"

10.

However, he denied that he recognized himself in the surveillance video of the robbery. He testified that he understood Destiny to be referring to a different surveillance video where he was filling up cars with gas. He acknowledged that he stated, "It looks just like me" (boldface omitted), after Destiny described the video of the robbery, but testified that there was a "question in [his] voice" and he was surprised.

Defendant acknowledged he was depicted in stills taken from video surveillance of the clothing store where Katherine's credit card was used. He denied he was the person depicted in the video or stills taken from video surveillance of the robbery. He estimated he weighed 225 to 230 pounds on the date of the robbery, and that the robber appeared to weigh approximately 160 pounds.

Defendant denied that he smirked at Anderson when Anderson commented on him robbing pregnant women. However, he acknowledged that he smirked when Anderson showed defendant the blue shoes and said they belonged to defendant because he thought Anderson was asking an obvious question.

A photograph was entered into evidence of a tattoo on the back of defendant's head that reads, "Madera."

III. **Prosecution Rebuttal**

Anderson testified in rebuttal that, based on his recollection of the cells where defendant and Garcia were housed, it would have been impossible for them to see each other while in the holding cells. However, he acknowledged defendant and Garcia would have seen each other "during the loading and unloading of people." He acknowledged there are video cameras throughout the facility but he did not watch any of the footage and the prosecutor did not request it. Anderson did not take defendant to an interview room because defendant "started giving [Anderson] a little bit of information and then he stopped." Anderson testified defendant reported renting the Malibu from someone named Harvey. Defendant stated he did not know the Malibu was stolen.

11.

## DISCUSSION

### I. Substantial Evidence of Identity

Defendant contends substantial evidence does not support the jury's finding that he was the perpetrator of the robbery and assault. Specifically, he contends the video evidence conclusively establishes he was *not* the perpetrator because the person in the video at the clothing store – who law enforcement believed to be defendant and who defendant admitted was him – has a different body type than the person in the video of the robbery. Therefore, he argues, the two videos cannot reasonably be found to depict the same person. Defendant also contends resolution of this issue involves the evaluation of "objective" evidence rather than credibility findings or the evaluation of live testimony, and he therefore argues we need not defer to the jury's findings and instead should independently review the evidence. We disagree on both points.

#### A. Standard of Review

"The test for evaluating a sufficiency of evidence claim is deferential: 'whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We must 'view the evidence in the light most favorable to the People' and 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*People v. Flores* (2020) 9 Cal.5th 371, 411.)

Defendant argues this standard does not apply and instead we should independently review the video evidence to conclude the evidence does not support his convictions on the first two counts. He asserts this court is in the same position as the jury with respect to its ability to evaluate the "undisputed" video evidence. In support, he relies on *In re Resendiz* (2001) 25 Cal.4th 230 (*Resendiz*), overruled on other grounds by *Padilla v. Kentucky* (2010) 559 U.S. 356, 370–371, *People v. Ogunmowo* (2018) 23

12.

Cal.App.5th 67 (*Ogunmowo*), and *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*). As we explain, these cases are inapposite.

The lead opinion in *Resendiz* involved a petition for writ of habeas corpus based on a claim of ineffective assistance of counsel arising from misadvice regarding the immigration consequences of a plea. (*Resendiz*, *supra*, 25 Cal.4th at p. 235.) The high court characterized the question of whether trial counsel performed competently as a mixed question of law and fact, which is " 'generally subject to independent review as predominantly [a] question[] of law.' " (*Resendiz*, at p. 248.) The court then articulated the applicable standard of review where "the superior court has denied habeas corpus relief after an evidentiary hearing … and a new petition for habeas corpus is thereafter presented to an appellate court based upon the transcript of the evidentiary proceedings conducted in the superior court." (*Id.* at p. 249.) In those circumstances, " 'the appellate court is not bound by the factual determinations [made below] but, rather, independently evaluates the evidence and makes its own factual determinations.' " (*Ibid.*) The factual determinations made below are nonetheless entitled to great weight, particularly if they depend upon the credibility of witnesses; such deference is not appropriate if the factual determinations are not based on the credibility of live testimony. (*Ibid.*)

*Ogunmowo* addressed an order denying a motion to vacate a conviction under section 1473.7[7] based on ineffective assistance of counsel in misadvising the defendant regarding the immigration consequences of his plea. (*Ogunmowo*, *supra*, 23 Cal.App.5th at p. 75.) Noting there was no published decision addressing the applicable standard of review, the Court of Appeal relied on *Resendiz* to hold that the question of whether counsel was ineffective was a mixed question of law and fact subject to independent review. (*Id.* at p. 76.) The court explained, "We accord deference to the trial court's

---

[7] Section 1473.7 permits a person no longer in criminal custody to file a motion to vacate a conviction or sentence on several enumerated grounds. (§ 1473.7, subd. (a).)

factual determinations if supported by substantial evidence in the record, but exercise our independent judgment in deciding whether the facts demonstrate trial counsel's deficient performance and resulting prejudice to the defendant." (*Ibid.*)

*Vivar* likewise involved a motion to vacate a conviction under section 1473.7 based on a claim of ineffective assistant of counsel for failure to advise the defendant of the immigration consequences of his plea. (*Vivar*, *supra*, 11 Cal.5th at p. 517.) The high court noted that the questions of "[w]hether counsel's advice regarding immigration was inadequate and whether such inadequacy prejudiced the defense, while mixed questions, are predominantly questions of law." (*Id.* at p. 524.) As such, application of the independent review standard was appropriate. (*Id.* at p. 525.) The high court noted that this standard, which is "the same standard governing [its] review of these claims on habeas corpus … is most consistent with section 1473.7's purpose: to offer relief to those persons who suffered 'prejudicial error' but are 'no longer imprisoned or restrained' and for that reason alone are unable to pursue relief on habeas corpus." (*Ibid.*) Ultimately, the high court's "embrace of independent review" was a product of multiple factors "with special relevance" to section 1473.7 proceedings: the history of section 1473.7 and the interests at stake, the fact that a section 1473.7 motion is likely to be resolved on a "cold record," and the "relative competence of trial courts and appellate courts [in] assess[ing] that evidence." (*Vivar*, at p. 527.)

Contrary to defendant's assertion, the foregoing cases do not hold that independent review is appropriate in every case in which appellate review is based on documentary evidence. Rather, *Resendiz*, *Ogunmowo*, and *Vivar* involved predominantly legal questions raised in a procedurally specific context that is traditionally afforded independent review. Meanwhile, this case involves a factual dispute as to whether defendant was the perpetrator of the crimes and the jury's factual findings on that point. It is axiomatic that a reviewing court defers to a jury's findings when supported by substantial evidence, irrespective of the form the evidence takes. (*People v. Ramirez*

(2022) 13 Cal.5th 997, 1117–1118; cf. *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 385 ["Deference is given to the factual findings of trial courts because those courts generally are in a better position to evaluate and weigh the evidence. [Citation.] The Courts of Appeal, on the other hand, are in a better position to resolve legal issues, because ' "appellate judges are freer to concentrate on legal questions" ' and the judgment of three or more judges is brought to bear in every case."].) Additionally, courts have rejected attempts to expand the reach of *Resendiz* and *Vivar* to other circumstances involving review of factual determinations that were based on documentary evidence. (E.g., *People v. Franco* (2024) 99 Cal.App.5th 184, 194 [declining to independently review factual findings based on documentary evidence on review of petition to be removed from California's registry of sex offenders]; *People v. Njoku* (2023) 95 Cal.App.5th 27, 43 [declining to independently review factual findings based on documentary evidence on review of the denial of a petition for resentencing brought pursuant to § 1172.6]; accord, *People v. Perez* (2018) 4 Cal.5th 1055, 1066 [deference is accorded to a trial court's factual findings on a petition for resentencing under the Three Strikes Reform Act of 2012 (Prop. 36) so long as the findings are supported by substantial evidence, even where the findings are based on a cold record].) Defendant does not cite, and we do not find, any case that has applied independent review to a jury's factual findings.

Furthermore, even if we were to accept the general proposition that some forms of documentary evidence could warrant independent review, independent review would not be appropriate here. We acknowledge defendant's point that at least one camera angle in one surveillance video depicting defendant at the clothing store appears to suggest defendant might have a dissimilar body type to the person depicted in the video of the robbery. However, multiple videos were admitted into evidence and shown to the jury, alongside other circumstantial evidence of defendant's guilt. The jury was charged with weighing all this evidence to determine whether guilt was proved beyond a reasonable

15.

doubt.  None of the cases cited by defendant suggest it is appropriate for us to pluck one piece of "objective" evidence from the rest and independently determine it undermines the jury's verdict, without regard for whether the remaining evidence is sufficient to support the jury's findings.

Accordingly, we review the entire record with deference to the jury's findings, to determine whether there is sufficient evidence on which a trier of fact could find defendant guilty beyond a reasonable doubt.  (*People v. Flores*, *supra*, 9 Cal.5th at p. 411.)

### B.    Analysis

Substantial evidence supports the jury's finding that defendant committed the robbery and assault.

As stated, multiple surveillance videos were entered into evidence.  Surveillance video of the robbery shows that the person who committed the robbery wore bright blue shoes and blue jeans in what appears to be a medium-to-dark wash.  The perpetrator's face and hands were covered and he was wearing a hat and a jacket.  Meanwhile, surveillance video taken at the grocery store approximately two hours after the robbery shows defendant accompanying Garcia to sell Katherine's cell phone while wearing bright blue shoes.  Video taken later that day of defendant using Katherine's credit card at a gas station and accompanying a woman to use Katherine's credit card at the clothing store likewise shows him wearing bright blue shoes.  Defendant was still wearing the bright blue shoes when he was arrested several days later.  Additionally, in the surveillance videos from the grocery store, gas station, and clothing store, defendant was shown wearing what appear to be jeans or pants in a medium-to-dark color.  Anderson opined, based on differences in the lighting in the different videos, that defendant appeared in these videos to be wearing the same dark jeans as the person in the video of the robbery.  The perpetrator of the robbery, like defendant, also had a tattoo across the

back of his head, and the jury had an opportunity to view defendant's tattoo in the courtroom.

Nonetheless, defendant asserts he cannot be the person depicted in the robbery video because the person depicted in the clothing store video is "heavyset" and "at least 50 pounds heavier than the man" who committed the robbery. It is true that the person in the clothing store video appears, in some frames, to have a heavier build than the person in the video of the robbery. In other frames, however, the person in the clothing store video appears to have a similar build to the person in the robbery video. The clothing store video is of relatively poor quality, with significant distortions from pixelation and shadowing. Additionally, the videos from the robbery and clothing store were taken from different angles and the person or persons depicted in the videos were wearing different styles of clothing. Review of the gas station video, where defendant appears to be wearing the same clothing as at the clothing store, presents similar challenges: in one angle defendant appears to have a similar build to the person in the robbery video. In another angle, defendant appears to have a heavier build. We note that, although the robbery video arguably suggests the perpetrator had a more slender build, Katherine described the perpetrator of the robbery as "heavier set" or "stock[y]" when speaking with a 911 dispatcher. Given the different quality and angles of the various videos and the differences in clothing, we disagree that the clothing store video conclusively refutes the jury's finding of guilt. A jury reviewing all the video evidence alongside the other circumstantial evidence could reasonably conclude the same person was depicted in all the videos.

Other evidence also supports the jury's finding of guilt. Defendant's knowing possession of Katherine's stolen credit card soon after the robbery is corroborating evidence that defendant was the perpetrator of the robbery. (*People v. Najera* (2008) 43 Cal.4th 1132, 1138 [possession of recently stolen property is insufficient to support a finding of guilt on its own, but can constitute circumstantial, corroborating evidence of

17.

guilt of theft-related crimes]; *People v. Gamble* (1994) 22 Cal.App.4th 446, 453 [" ' "It is settled that when a person is shown to be in possession of recently stolen property slight corroborative evidence of other inculpatory circumstances which tend to show guilt supports the conviction of robbery." ' "].) Likewise, defendant's wearing of the blue shoes while accompanying Garcia to sell the stolen cell phone soon after the robbery is circumstantial evidence of his guilt. (*People v. Portillo* (2023) 91 Cal.App.5th 577, 602.) Defendant points out that he could have received the stolen credit card and shoes after the robbery. However, on substantial evidence review, we review the evidence in the light most favorable to the judgment. " 'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

In addition to the foregoing, the jury heard a jail phone call in which Destiny stated there was a video of defendant at the car wash or gas station, to which defendant replied, "What it show me doing?" When Destiny responded, "Getting out the car, grabbing a purse, getting in and going," defendant asked, "It look just like me?" The jury reasonably could conclude that defendant's statements constituted adoptive admissions that defendant was the person depicted in the video and, as such, the perpetrator of the robbery. (See Evid. Code, § 1221.) The jury also heard evidence that defendant previously was convicted of robbery in relation to a very similar purse-snatching incident. (Evid. Code, § 1101, subd. (b).)

Taken together, the video evidence, viewed alongside defendant's use and possession of Katherine's stolen property, possession of the distinctive blue shoes, adoptive admission of being present at the robbery, and commission of a prior similar robbery, constitute substantial evidence to support the jury's finding that he was the perpetrator of the robbery and assault.

## II. Ineffective Assistance of Counsel

Defendant contends his trial counsel was ineffective in failing to address various matters relating to defendant's jail call with his daughter Destiny, in which they discussed the video of the robbery. We note that defendant does not contend counsel should have objected to the admission of the jail call itself. Rather, he contends counsel should have (1) requested a " 'limited purpose' " instruction prior to admission of the call, (2) objected to the prosecutor's questioning of defendant as to whether Destiny recognized him in the video, (3) requested a " 'limited purpose' " admonition in response to this questioning, (4) objected to the prosecutor's closing argument on this point, (5) requested a jury instruction to disregard the improper argument, and (6) requested a " 'limited purpose' " admonition in response to the improper argument. He contends a reasonable attorney "would have taken at least *some* steps to avoid the harm of unfettered admission" of Destiny's statements in the call, and counsel's combined failures allowed the jury to consider Destiny's apparent opinion that defendant was the person depicted in the robbery video, as opposed to limiting the jury's consideration to whether defendant admitted, by way of an adoptive admission, that he was the person depicted in the robbery video.

### A. Additional Background

Prior to trial, the court asked the prosecutor whether she was planning to call Destiny to identify her own voice in the jail call. The prosecutor stated she did not think it would be necessary because defendant identified himself in the jail call. The court queried whether it mattered who defendant was speaking to, and explained, "It is him. It is his statement. So it is going to be an admission, which is a hearsay exception. And their comments are only relevant to explain his words. I don't know if it matters who he is talking to, but those are things that you can work out."

At trial, the prosecutor introduced the jail call between defendant and Destiny and played the call for the jury. Defense counsel did not object or request a limiting

19.

instruction or jury admonition. During the call, the following exchange occurred between defendant and Destiny:

> "Defendant: But, I'm hoping that hopefully, I beat it. If I don't, it's probably going to be a long time. But, I should have a good chance of beating it, because I seen the whole thing. They showed me the video. I'm pretty sure it's clear it's not me. But, did you see the video?
>
> "Destiny [T.]: *You know there's a video of you at the car wash or the gas station?*
>
> "Defendant: At a car wash?
>
> "Destiny [T.]: At the gas station.
>
> "Defendant: At which car wash?
>
> "Destiny [T.]: I don't know, the gas station on Shell.
>
> "Defendant: The gas station at Shell?
>
> "Destiny [T.]: Yeah, the car wash or gas station, whatever it was.
>
> "Defendant: What it show me doing?
>
> "Destiny [T.]: Getting out the car, grabbing a purse, getting in and going.
>
> "Defendant: It look just like me?
>
> "Destiny [T.]: Yeah.
>
> "Defendant: You seen the face too?
>
> "Destiny [T.]: No, I think you're wearing a mask.
>
> "Defendant: Man, that's crazy.
>
> "Destiny [T.]: You can hear him too.
>
> "Defendant: What he say?
>
> "Destiny [T.]: Where's the car wash? How you go in? [inaudible … ] on Facebook." (Italics added, timestamps omitted.)

20.

At the jury instruction conference, the parties discussed instructing the jury on adoptive admissions. The prosecutor argued the instruction would relate "to the jail call when Destiny's describing the car wash surveillance video to [defendant]." The court stated defendant's statement "could be denial, but it could be interpreted in both ways," and therefore determined it would give the instruction.

Defendant was questioned regarding the jail call during his direct testimony. He recalled Destiny saying, "Hey, I saw the surveillance video. That looks like you." (Boldface omitted.) He also recalled responding, "That's crazy." (Boldface omitted.) He explained that both he and Destiny were sad during this conversation. Defendant denied being at the crime scene or committing the robbery.

Defendant also was cross-examined regarding the jail call. He acknowledged that he said, "What does it show me doing?" but denied that he recognized himself in the video. He explained that he understood Destiny to be referring to a video of him at a gas station filling up cars with gas. He explained that when he said, "It looks just like me" (boldface omitted), there was a question in his voice and he was surprised. The following colloquy then occurred:

> "**Q    So your own daughter recognized you in the surveillance video, isn't that true?**
>
> "A    Well, with the video they showed my booking picture, and so they had my picture next to the video of the robbery.
>
> "**Q    But she's not talking about your booking picture. She's talking about the surveillance video; isn't that true?**
>
> "A    Yeah. And my -- like I said, I talked to my daughter a hundred -- several other calls, and she said that's my picture. She said, 'Everybody makes mistakes, but they got yours blasted on the news, like, it was you.'
>
> "**Q    But that's not what she's referring to here?**
>
> "A    Yeah, she says.

"**Q    So she's talking about the surveillance video here; correct?**

"A    Well, she said, 'I think you're wearing a mask.' So I don't even think she seen the video. So I don't know how she could decipher if it was me or not with a mask.

"**Q    Were you wearing a mask at the car wash at Shell?**

"A    I told you I never -- I did not rob that lady. It was not me. I used her credit cards, yes. Did I rob her? I did not. The person in the robbery clearly doesn't have tattoos in the back of his neck. I'm covered in tattoos, but I haven't been questioned about that.

"**Q    So when your daughter asks you -- or talks to you about the surveillance video, you don't deny that that's you in the video?**

"A    Well, I tell her, 'Man, that's crazy,' .…"

The jury was instructed on "Limited Purpose Evidence in General" (boldface omitted) as follows: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

The jury also was instructed with CALCRIM No. 357 regarding adoptive admissions, as follows:

"If you conclude that someone made a statement outside of court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true:

"1.    The statement was made to the defendant or made in his presence;

"2.    The defendant heard and understood the statement;

"3.    The defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true;

"AND

"4.    The defendant could have denied it but did not.

22.

"If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true.

"If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

The prosecutor referenced the jail call during closing argument as follows:

"Okay. This is small, but we did listen to this jail call earlier today. This is the jail call defendant makes to his daughter, Destiny [T.]. And if you recall, she's speaking with him about the surveillance video that we just watched and she tells him, 'You know, there's a video of you at the car wash.' Defendant doesn't deny it. He confirms, 'At a car wash,' question mark. She further confirms, 'At the gas station.' So defendant's, again, confirming at which car wash, still not denying what video it was that she saw. Further on in the conversation he says, 'What does it show me doing?' Notice how he refers to himself? 'What does it show me doing in the video?' He's curious. He wants to know. He knows that's him in that video. *His daughter, his own daughter knows that's him in that video.*

"She describes what it is in the video, getting out of the car, grabbing a purse, getting in and going. Again, defendant has another opportunity to deny that that's him, but he doesn't. Again, he says, 'It looks just like me,' referring to himself. 'It looks just like me?' His daughter says, 'Yeah.' He asks if she had seen the face. She said, 'I think you're wearing a mask.' So, clearly, his own daughter recognizes him in that surveillance video. And defendant's response, 'Man, that's crazy.' That's not a denial. That's not a denial.

"So judge read you this instruction, one of many. It's called adoptive admissions. So this instruction states that if a statement was made to the defendant, so here we have the phone call. His daughter made a statement to her father. The defendant heard and understood, clearly, he did. He was repeating it back to her. 'There's a video at the car wash, at the gas station?' He's confirming with her. He hears her.

"Number three, the defendant would under all circumstances naturally have denied the statement if he thought it was not true. So there's three times in that phone call where he could have said, 'It's not me. That's not me.'

"Four, the defendant could have denied it, but did not. He never denies it. He says, 'Man, that's crazy.' That's not a denial. So you can use

23.

that as evidence to show that he knew it was him in that video. *His daughter knew it was him.* He knew it was him." (Italics added.)

Defense counsel responded to this argument as follows:

"Now, there's a -- prosecutor said that there's adoptive admission, which means you don't have to say, but if you don't deny, that implies admitting, okay, conversation with Destiny, his daughter, okay. And you heard it. You have the tape. You have the transcript. This, all I can say about this, my client testified -- my client testified that he's been in jail all his life. What do you think Destiny thinks of [her] father? So when [s]he saw the surveillance tape, even though he cannot -- she cannot see face or hands or tattoos, she assumed that it's him 'cause it looks like him, and he's in the jail when he called for the same -- same crime, okay. She didn't have any more or any more accurate information than you saw, right, on the surveillance video. Same surveillance video that she saw from the police. From that, I believe, she assumed that it was her father 'cause she already suspect him of doing things like this, okay. So when my client says, 'That's crazy,' okay, 'Did you -- did you see my face?' Did -- what did he say? Okay. 'That's crazy.' That's denial. That's not admitting, 'Oh, yeah, I'm the one. I was the one.' And, again, Ladies and Gentlemen, the opinion of Destiny has to be based on facts, other evidence, okay. All evidence I present you why there's a reasonable doubt. That alleged admission cannot, by itself, prove guilt for Count One and Two, okay."

The prosecutor briefly addressed this point in rebuttal, arguing, "*His own daughter recognized him in the surveillance video.* So that's him. That's him at the robbery. That's him at [the grocery store]. That's him getting gas. That's him when he's arrested." (Italics added.)

## B. Applicable Law Regarding Adoptive Admissions

"Hearsay is 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless some exception to the hearsay rule is satisfied. (*Id.*, subd. (b).) '[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception.' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 44.)

24.

"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.)  " '[I]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 661.)  "Thus, ' " '[w]hen a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it.' " ' " (*People v. McDaniel* (2019) 38 Cal.App.5th 986, 998.)  In these circumstances, "incriminating statements made by another become the defendant's ' " ' "own admissions" ' " ' " (*People v. Mendez* (2019) 7 Cal.5th 680, 701), and " ' "[t]he 'witness' against the defendant is the defendant himself," ' notwithstanding that the words the defendant adoptively admitted were spoken by someone else" (*People v. Armstrong* (2019) 6 Cal.5th 735, 790).

### C. Applicable Law Regarding Ineffective Assistance of Counsel

Defendant bears the burden of demonstrating ineffective assistance of counsel. (*People v. Mickel* (2016) 2 Cal.5th 181, 198.)  " '[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing:  that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 736.)  In determining whether counsel's performance was deficient, we consider whether " ' " 'counsel's representation fell below an objective standard of

reasonableness under prevailing professional norms.' " ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 653.) " 'On direct appeal, a finding of deficient performance is warranted where "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." ' " (*People v. Dunn* (2025) 18 Cal.5th 129, 169.) "Rarely is ineffective assistance of counsel established on appeal since the record usually sheds no light on counsel's reasons for action or inaction." (*People v. Woodruff*, at p. 736.)

### D.     Deficient Performance

We begin with defendant's contention that counsel's performance was deficient because counsel failed to object to the prosecutor's cross-examination of defendant as to whether Destiny recognized him in the video. " ' "[A]n attorney may choose not to object for many reasons" ' " and the failure to object to improper questions or testimony rarely establishes ineffective assistance of counsel on appeal. (*People v. Gurule* (2002) 28 Cal.4th 557, 609–610.) Here, a reasonable, tactical reason for counsel's failure to object is apparent from the record. Despite defendant's contention that these questions improperly solicited testimony regarding Destiny's perceptions to establish their truth, the questions were foundational to the prosecutor's argument that defendant's responses to Destiny constituted an adoptive admission. To reiterate, the prosecutor asked defendant, "So your own daughter recognized you in the surveillance video, isn't that true?" (Boldface omitted.) After further discussion as to whether Destiny was referring to the surveillance video or defendant's booking photo, the prosecutor asked, "So when your daughter asks you -- or talks to you about the surveillance video, you don't deny that that's you in the video?" (Boldface omitted.) Because the question of whether Destiny identified defendant in the video was relevant to whether the statement called for a response, and therefore whether defendant adopted Destiny's statement as his own, it is unlikely any objection by defense counsel would have been sustained. Because the

26.

objection would have been unsuccessful, counsel's failure to raise it does not constitute ineffective assistance. (See *People v. Anderson* (2001) 25 Cal.4th 543, 587 [counsel not ineffective for failing to make futile or unmeritorious objections].)

Defendant also contends counsel should have requested limiting instructions and admonitions at various points to advise the jury that it could consider Destiny's statements only to the extent they provided context for defendant's statements, and not for the truth of Destiny's perceptions or opinions. Similarly, defendant contends counsel should have objected to the prosecutor's closing argument relying on Destiny's perception that defendant was depicted in the video and should have requested a jury admonition to disregard the argument. Again, a failure to object to improper questions or argument rarely establishes ineffective assistance of counsel on appeal. (*People v. Gurule*, *supra*, 28 Cal.4th at p. 610; *People v. Kelly* (1992) 1 Cal.4th 495, 540.) Likewise, an attorney may have tactical reasons for declining to request a limiting instruction or jury admonition. (*People v. Maury* (2003) 30 Cal.4th 342, 394 ["A reasonable attorney may have tactically concluded that the risk of a limiting instruction … outweighed the questionable benefits such instruction would provide."]; *People v. Boyette* (2002) 29 Cal.4th 381, 432 [objection and request for admonition "runs the risk of drawing the jury's attention to an improper line of argument"].)

Here, counsel was not asked to provide a reason for his omissions, and this is not a case where the record discloses no rational tactical purpose for the omissions or that there could be no satisfactory explanation. (*People v. Dunn*, *supra*, 18 Cal.5th at p. 169.) The record reflects defense counsel was well aware that the identity of the robber was the central issue in this case. It additionally is clear from the record that counsel was aware Destiny's jail call statements were damaging to defendant. Counsel's defense strategy was to focus on the fact that the prosecution's case rested significantly on defendant's use and possession of the blue shoes, an item which easily may be transferred from person to person. With regard to Destiny's statements, defense counsel chose to undermine the

27.

reliability of Destiny's identification and to argue defendant's statements did not constitute admissions. Specifically, counsel argued Destiny was in no better position to identify defendant in the video than the jury, and she assumed defendant was the perpetrator because he had been arrested for the crime and had been "in jail all his life." We cannot say counsel was ineffective in choosing to challenge Destiny's ability to accurately identify defendant, rather than asking that the jury be admonished and instructed to disregard the identification, particularly given the relationship between the identification and defendant's putative admission.

Because there are plausible tactical explanations for the omissions claimed by defendant, defendant has not shown defense counsel's performance was deficient.

### E. Prejudice

Even if we assume counsel's performance was deficient, defendant has not shown " 'there is a reasonable probability the outcome would have been different were it not for the deficient performance.' " (*People v. Woodruff*, *supra*, 5 Cal.5th at p. 736.)

The jury was instructed that, if it determined the requirements for an adoptive admission were met, it could conclude that defendant admitted Destiny's statements were true. However, the jury also was instructed that, if it determined the requirements for an adoptive admission were not met, it could not "consider *either the statement* or the defendant's response for any purpose." (Italics added.) The prosecutor drew the jury's attention to the instruction regarding adoptive admissions during closing argument. We presume the jury followed the court's instructions. (*People v. Chhoun*, *supra*, 11 Cal.5th at p. 30.) Accordingly, to the extent the jury determined the requirements for an adoptive admission were met, it was permitted to conclude defendant admitted he was the person depicted in the robbery video. In contrast, if the jury determined the requirements for an adoptive admission were not met, it was required to disregard Destiny's statements, including her opinion that defendant was the person depicted in the robbery video. Thus, if the jury considered Destiny's statements for any purpose, it also necessarily concluded

defendant admitted he was the person depicted in the video. Destiny's belief that defendant was the person depicted in the video was therefore of marginal significance. There is no reasonable possibility the outcome would have been different had the court instructed or admonished the jury regarding the limited purpose of Destiny's statements, or had counsel raised related objections.

We additionally note Destiny's opinion was not a significant part of the prosecutor's argument. Rather, the prosecutor focused the jury's attention on defendant's admission; the video evidence, which the jury itself had viewed; and the other circumstantial evidence tying defendant to the crime, such as his possession of the blue shoes and Katherine's credit cards. Given the limited significance of Destiny's opinion and the strength of the other evidence, defendant has not shown prejudice.

Accordingly, his claim of ineffective assistance of counsel necessarily fails.

## III. Restitution Fine

Defendant argues he was deprived of his rights to due process, equal protection, and protection from excessive fines under the state and federal Constitutions when the trial court imposed a $10,000 fine despite a lack of substantial evidence that he is able to pay.

During the pendency of this appeal, our Supreme Court decided *People v. Kopp* (2025) 19 Cal.5th 1, 23 (*Kopp*), which holds that an excessive fines analysis under the United States and California Constitutions is the proper vehicle to challenge punitive fines, such as a restitution fine, on constitutional grounds. We requested supplemental briefing on the effect, if any, of *Kopp* on the issues presented in this appeal. In supplemental briefing, defendant states he is challenging only the lack of substantial evidence to support the court's finding that he has the ability to pay. He therefore argues *Kopp* has no bearing on the issue presented here because he "is *not* seeking a broad decision about the constitutionality of his restitution fine." As such, he seemingly has disavowed the constitutional arguments raised in his opening brief, stating he is not

29.

"arguing broadly that the trial court violated the [C]onstitution by imposing the fine," but rather asserting "the trial court abused its discretion by making an ability to pay finding that was wholly unsupportable."

We conclude the court did not abuse its discretion in determining defendant had the ability to pay the restitution fine.

### A.    Additional Background

At sentencing, the court imposed a $10,000 restitution fine pursuant to section 1202.4, as well as a $10,000 parole revocation restitution fine pursuant to section 1202.45, the latter of which was stayed.  Defense counsel pointed out that defendant was likely to spend the rest of his natural life in prison, and the fine would result in some of the money put into his prison trust account by his family being taken away to pay the fine.  Counsel asked the court to reduce the fine to $5,000.  The court explained:

> "I understand that he won't be working in the normal sense out of prison, but he's still able to work within the prison.  I believe the statutory amount fine is appropriate.  He's able bodied, he has no disability or inability to work and I think it's appropriate given the circumstances of the crime, so I'm not going to reduce that."

The court also noted that it had reduced other fees and assessments it had imposed.

### B.    Applicable Law

"A restitution fine is distinguished from orders that restitution be made to a victim or to the state's Restitution Fund.  [Citation.]  A restitution fine under section 1202.4 constitutes punishment.  [Citation.]  It is required in 'every case where a person is convicted of a crime' unless the court 'finds compelling and extraordinary reasons for not doing so and states those reasons on the record.'  [Citation.]  For felony convictions, the required fine is not less than $300 and not more than $10,000.  [Citation.]  [Italics & fn. omitted.]

"By statute, '[a] defendant's inability to pay [the minimum $300 fine] shall not be considered a compelling and extraordinary reason not to impose a restitution fine.'

30.

[Citation.] However, an inability to pay may be considered when 'increasing the amount of the restitution fine in excess of the minimum' amount. [Citation.] A defendant 'shall bear the burden of demonstrating the defendant's inability to pay.' [Citation.] ….

"Finally, '[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole,' the court must impose a parole revocation restitution fine (hereafter 'parole revocation fine') in the same amount as the restitution fine. [Citation.] However, this fine 'shall be suspended unless the person's parole … is revoked.' " (*Kopp*, *supra*, 19 Cal.5th at pp. 13–14.)

Due process does not require an ability to pay hearing before imposing every punitive fine. (*Kopp*, *supra*, 19 Cal.5th at p. 23.) However, to the extent a punitive fine is challenged on constitutional grounds, the excessive fines analysis is the proper vehicle for examining the challenge.[8] (*Kopp*, at p. 23.) "Although fines may properly be imposed as punishment for crime, both the federal and state Constitutions prohibit excessive fines. [Citations.] As the United States Supreme Court has observed, the 'touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish.' " (*Ibid*.) Under the excessive fines clause, courts consider the following four factors in determining whether a fine is disproportionate: "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th

---

[8] The California Constitution states, "Cruel or unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17.) The Eighth Amendment of the United States Constitution states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.)

707, 728.) "While ability to pay may be part of the proportionality analysis, it is not the only factor." (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1057 (*Lowery*).)

Inability to pay is also a statutory factor that may be considered in imposing a restitution fine above the minimum. (*Kopp*, *supra*, 19 Cal.5th at pp. 23–24.) A defendant bears the burden of establishing his or her inability to pay. (§ 1202.4, subd. (d) ["A defendant shall bear the burden of demonstrating the defendant's inability to pay"].)

A court's ruling on ability to pay is reviewed for abuse of discretion. (*Kopp*, *supra*, 19 Cal.5th at p. 24.)

## C.    Analysis

As stated, the excessive fines clause is the proper vehicle for examining a constitutional challenge to a restitution fine.[9] (*Kopp*, *supra*, 19 Cal.5th at p. 23.) Although an excessive fines analysis involves several factors bearing on proportionality (*Lowery*, *supra*, 43 Cal.App.5th at p. 1057), defendant addresses only the factor relating to ability to pay. He also challenges his ability to pay as a statutory factor that may be considered in imposing a restitution fine above the minimum. Defendant does not dispute the court's findings that he is able bodied and had no disability or other inability to work. Rather, he contends (1) he will be unable to pay the $10,000 restitution fine out of any minimal prison wages he may earn and (2) requiring him to make payments toward the restitution fine while incarcerated will impede his ability to make required purchases toward his own basic needs. For reasons we explain, we conclude the court did not abuse its discretion in determining defendant has the ability to pay the $10,000 restitution fine.

Numerous courts have held that the prospect of earning future prison wages is relevant to a defendant's ability to pay. (*Lowery*, *supra*, 43 Cal.App.5th at pp. 1060–

---

[9] Because our Supreme Court has held that the excessive fines analysis is the proper vehicle for challenging a punitive fine on constitutional grounds, we do not consider defendant's due process and equal protection arguments.

32.

1061; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076; *People v. Castellano* (2019) 33 Cal.App.5th 485, 490, disapproved on another ground in *Kopp*, *supra*, 19 Cal.5th at p. 23, fn. 17; see § 1202.4, subd. (d) ["Consideration of a defendant's inability to pay may include the defendant's future earning capacity."]; but see *Kopp*, at p. 35 (conc. opn. of Liu, J.) ["Courts should not indulge speculative or unrealistic notions of future [prison] wage-earning opportunities when assessing a defendant's ability to pay fines or fees."]; *People v. Montes* (2021) 59 Cal.App.5th 1107, 1123–1124 [holding that it would be speculative to rely on future prison wages to determine ability to pay where the record on this point was undeveloped].)

Indeed, cases have acknowledged and rejected the points raised by defendant. Although defendant is correct that there is some uncertainty as to whether he will be afforded a prison work assignment (see Cal. Code Regs., tit. 15, § 3040, subd. (k) ["An incarcerated person's assignment to a paid position is a privilege dependent on available funding, job performance, seniority and conduct. These factors shall be criteria considered in determining an incarcerated person's eligibility for pay earning status and rate of pay."]), at least one court has opined that there is a "strong likelihood" a healthy individual serving a lengthy prison sentence will be able to obtain and hold a paid position long enough to make some progress toward his or her financial obligations. (*People v. Cervantes* (2020) 46 Cal.App.5th 213, 229; accord, *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487 [" 'Ability to pay does not necessarily require existing employment or cash on hand.' "].)

Defendant also is correct that the wages he might receive from prison work are relatively minimal. (See Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1) [setting general pay rates between $0.16 and $0.74 per hour]). However, "[t]he state may garnish between 20 and 50 percent of those wages to pay the section 1202.4, subdivision (b) restitution fine. (§ 2085.5, subds. (a), (c); *People v. Ellis* (2019) 31 Cal.App.5th 1090, 1094.)" (*People v. Aviles*, *supra*, 39 Cal.App.5th at p. 1076; see Cal. Code Regs., tit. 15,

§ 3097, subd. (c) [providing for the deduction of 50 percent of an incarcerated person's wages and trust account deposits for payment toward a restitution fine, subject to certain exemptions].)  Accordingly, numerous courts have held that an inmate may make progress toward his financial obligations, despite the low wages afforded to prisoners. (See *People v. Oliver* (2020) 54 Cal.App.5th 1084, 1101 [acknowledging prison wage rates but nonetheless concluding the defendant has the ability to pay fees and assessments through prison wages and gifts]; *Lowery*, *supra*, 43 Cal.App.5th at pp. 1060–1061 [same]; *People v. Aviles*, at p. 1076 [same].)  "It is illogical to conclude that [defendant] will not have an ability to begin paying at least some of the imposed fees, fines and assessments while [he is] incarcerated." (*Lowery*, at p. 1060.)

Defendant complains that deductions from his prison wages toward his restitution fine will affect his ability to purchase items necessary to comply with prison regulations. However, the Department of Corrections and Rehabilitation is required to provide defendant with the basic necessities required to comply with prison regulations regarding cleanliness and hygiene.  (Cal. Code Regs., tit. 15, §§ 3030 [clothing and linen], 3060 [means for inmates to keep themselves and their living quarters clean], 3061 [basic supplies for personal hygiene].)  Other, additional supplies may be provided to inmates who are indigent.  (E.g., Cal. Code Regs., tit. 15, § 3138; see *id*., § 3000 [an incarcerated person is "indigent" if they maintain trust account balance of $25 or less for 30 consecutive days].)  Significantly, the burden of seizing a portion of defendant's income is "blunted by the fact that he would retain at least some of the money" that he earns. (*People v. Potts* (2019) 6 Cal.5th 1012, 1056; see Cal. Code Regs., tit. 15, § 3097, subd. (c).)  Accordingly, we reject defendant's contention that he is unable to pay the restitution fine because doing so will require him to "spend decades disregarding his right and

obligation to keep himself clean and hygienic, in favor of making marginal incremental progress toward payment of the fine."[10]

Based on the foregoing, the trial court did not abuse its discretion in determining defendant is able to pay the $10,000 restitution fine. Because defendant does not argue the fine was unconstitutional on any other grounds and does not otherwise challenge the proportionality of the fine, his constitutional arguments likewise fail.

## **DISPOSITION**

The judgment is affirmed.

DETJEN, J.

WE CONCUR:

HILL, P. J.

PEÑA, J.

---

[10] Moreover, pursuant to section 1465.9, the balance of defendant's restitution fine will become unenforceable and uncollectible 10 years after the date of imposition, and the remaining portion of the judgment imposing the fine will then be vacated. (§ 1465.9, subd. (d); Stats. 2024, ch. 805, § 1.)